This morning is number 135094 Lakeshore Engineering Services against the United States. Mr. Abernathy. Thank you, your honor. Please the court, Phil Abernathy on behalf of Lakeshore Engineering Services, the appellant. The whole concept of the contract which is at issue in this case is that the successful bidding contractor was required to perform any and all construction services requested of it by the government at Fort Rucker, Alabama over a five-year period. Now at the time the bids went in for that work, nobody knew what those construction services were going to entail over that five-year period and they couldn't be priced. So what the government did was to incorporate an entire book of prices called the Gordian book, UPB, over 2,500 pages, over 70,000 line items of individual construction activities and this book gave the direct cost in that area for those activities. And then how can you just explain mechanically how the dollar figure for each subsequent order was calculated? Let's assume the government said to the contractor, we want you to install 10,000 square feet of sheetrock. You would go to the book, you would look up finished sheetrock and it might give a dollar a square foot. The direct cost to the contractor, the price to the contractor then would be $10,000 to install 10,000 square feet of finished drywall. Now what the contractor priced in his bid was a coefficient factor, a multiplier, and that was to cover the contractor's indirect costs, home office, field office overhead. And now you have, what is it, you said 1,000 square feet, 10,000 square feet? $10,000 square feet. Okay, and then what do you do with this coefficient and which of the coefficients do you use? The coefficient is a multiplier and it was by the contractor. In this case, Lakeshore Engineers bid 1.28. That's for the regular hour work? That's the markup, the indirect costs. So you would take the 1.28, what the contractor is saying is, I'm going to bid 28 percent of the direct costs for indirect costs. So you would take the 1.28, multiply it by the $10,000 and that would be the total cost paid to the contractor. This is, I don't actually think this has anything to do with the issues, but I'm just confused. There's a regular hour coefficient and an overtime hour, and I literally do not understand where hours fit into this. Well, hours could be in the labor rate. In other words, to install the 10,000 square feet of drywall, it may be 100 hours. If everybody agrees that's going to be expedited overtime work, then a different factor would apply, like 1.5. But the base rate that the contractor bid was 1.28. So do you, but how do you tell when they say build this drywall? Is there a determination of the number of hours it will take and how many of them are regular and how many are? That would have to be agreed on between the contractors and what they call the pre-construction meeting as to what factor would apply. Okay. But the key thing was the multiplier. I have a couple questions just about what you've said so far. Okay. And they're related. One is that as you laid it out, it kind of sounded as if you got this Gordian book and these are the prices and this is what the cost is and everybody's on board that this is precisely the cost. And I'm not sure why you think that's the case. And the second kind of piece of that is when you mentioned the coefficient and what it was based on, I think you just mentioned the indirect cost. And my understanding, so you can correct me if I'm wrong, is that the solicitation also indicated that the coefficient was also necessary to account for business risks. So, and that would be beyond the indirect cost. That, in my view, would cover things like inflation or availability or supply and stuff like that. So if you could respond. Yes, Your Honor. That's certainly the key question. We all know who's going to bear the risk if the contractor's bid for the coefficient is wrong. Let's assume his actual costs were going to be 40 percent, but he only bid 25 percent. He's going to have to eat the difference. The issue before you today is who bears the risk if the book prices are wrong. If the direct cost in that book for the local price of installing 10,000 square feet of drywall turns out to be two dollars a square foot instead of one dollar in the book, does the contractor eat that 100 percent overrun? Is that his risk? And the answer to that is found simply in four pages in the record. And I hope you'll look carefully at these four pages. First, you look at A355. This is the introduction to the Gordian book. It's called Section 0 of the Gordian book. And at A355, the Gordian book set out what the coefficient was to cover. And the last paragraph on that page says it's to cover business risk, including inflation and material cost fluctuations. Then the next page of the record, A356, the publishers of the column second paragraph under price variations, the publisher said, while diligent effort is made to provide accurate and reliable up-to-date pricing, it is the responsibility of the contractor to verify the unit prices and to modify their adjustment factor accordingly. So if the government wanted to place the burden on the contractor, there's the language. It was given to them by the publisher of the Gordian book. All the government had to do was incorporate that into the contract, and it would have been clear who had the risk. The government did just the opposite. They deleted that language we just talked about from the contract. Well, I guess your conclusion is based on certain assumptions, and I'm not just following you all the way. Assuming they didn't put this in, that doesn't mean that they said necessarily the opposite of that, right? And it seems like you're saying, well, because they didn't put this information in, then they guaranteed the opposite of that, and I'm not following why that's necessarily so. And the other point is, the one I referred to earlier, was that I thought in the solicitation, at least, they did talk about the coefficient accounting for business risks, and I think some of the stuff you talk about, availability, inflation, and that sort of stuff, comes within the rubric of business risks, and therefore, indeed, portions of this were, in fact, covered in the solicitation. Your Honor, my point is based on this. These two sections we just looked at in the record, if they had been incorporated into the contract, would have clearly defined who had the risk. Instead, the government deleted section zero of the Gordian book. It incorporated only sections one through sixteen of the book, which were the prices. It deleted the introduction. This, I think, would bear some clarification. They didn't explicitly delete it. They didn't mention it, and so that, by, I think, a fair reading at that stage, would have been, perhaps, that section zero wasn't included. However, it was provided. It was an attachment, Your Honor. It was attached, and it was there, and one would assume that the contractor observed it, and would ordinarily have observed the difference in the statement as to business risk of, let's say, major price changes from the Gordian book, as opposed to what would be sufficiently small so that one wouldn't fight about it. And that's the key, because the contractor could read section zero in the attached Gordian book, and then they would read in the solicitation that section zero was not incorporated into the contract. But it didn't say section zero is excluded. It just didn't mention it. It said sections one through sixteen are incorporated into the contract, but the government didn't stop there. They went one step further. They went into section zero of the Gordian book, and they picked out certain language, and they put it in the contract. They cherry-picked language from section zero and put it into the contract. For instance, on business risk, we saw what the Gordian book said about business risk at A-355. Here's what the government said about business risk in the solicitation at, that will be at A-292. They said the coefficient will cover other risk of doing business, i.e., risk of lower than expected contract dollar value, risk of poor subcontractor performance and re-performance, period. They took out those key words, inflation. Can you tell me where on 292 you're referring to? The fourth line from the bottom. Okay. Other risk of doing business. They specifically took out, you remember, the Gordian book mentioned subcontractor performance and re-performance, and it immediately by inflation and material cost fluctuations. The government picked out subcontractor performance, put it in the contract. They did not put in material cost escalation and inflation. Then we looked at earlier what the Gordian book said about the risk being on the 321. The government has a whole paragraph in the contract about contractor responsibility. They deleted that section that was in the Gordian book that we just looked at that said, while diligent effort is made, it's up to the contractor to include in his coefficient any risk of incorrect prices. That appears nowhere in the contract, even though they cherry-picked from section zero and put certain language in the solicitation, they eliminated all language about the contractor's risk and the risk of inflation. Your Honor, that's the key. Okay. Can I just ask, Judge Allegra said that if you look at the introduction, the division zero, any reader of the rest of the chapters 1 through 16 would have to rely on division zero to understand and use the rest, and therefore necessarily, though not explicitly, it's incorporated. Is the premise right that if you just snipped out division zero, could somebody reasonably use 1 through 16 and follow it without saying, I don't know what this means, I need an instruction manual or something? If you took out all of division zero and you just read that part of division zero that the government put into the solicitation, you could follow it. It would make sense. It would tell the contractor what to do. And at the pre-construction, pre-bid conference, nobody said we don't understand it. It was clear what they were doing. Now, the lower court judge was correct, in my opinion, when he said the publishers of the book could not have been clearer. And that's true. And all the government had to do if they wanted to be just as clear was incorporate section zero into the specifications and into the contract. They did not. They cherry-picked language from section zero and specifically eliminated the language about the contractor risk of the prices being wrong, about inflation, and about cost fluctuations. I'm going to reserve the rest of my time, but I hope counsel for the government will give you one logical, reasonable, persuasive reason why the government, if it wanted to put the risk on the contractor of the price book being wrong, would have deleted the very language used by the publishers of the book to put that risk on the contractor. All right. We'll ask Ms. McCarthy that question. Thank you, Your Honor. Thank you, Mr. Abernathy. Good morning, Your Honors. May it please the Court. The trial court correctly concluded below that Lakeshore should not be able to negate the fixed price term of its contract by essentially trying to convert it into a cost reimbursement contract. Division zero was not excluded from the contract, if I could just directly address Lakeshore's primary argument. If you draw Your Honor's attention to page 320 of the joint appendix, it makes it very clear that the entire Gordian book is attached to the contract. Let me tell you what is so troublesome to me about this direct admissions and statements by varying contracting officers that they knew that the price of steel and other prices had spiked after Katrina, and they raised concern about whether those prices were accurately reflected in the Gordian book. And on that record, how can the Gordian book that it wasn't either unilateral mistake or mistake on the part of the government or mutual mistake when it turned out and was observed by the government that there was this significant discrepancy between what was in the book and what we're now trying to hold the the actual situation was as the varying contracting officers and as the record shows in their testimony that they knew that something was wrong, that something had happened and that the book wasn't correct. So why is it conscionable for our great government to hold nonetheless this contractor to what you know were the wrong prices? Your Honor, with all respect, I would say that's not what the record demonstrates below and that's not what Judge Allegra found below. What the record demonstrates below is that there was concern within the government and that the Gordian book, the Gordian group was asked to update the prices in 2006, which it did, and there's no dispute that the prices were updated. There is not a scintilla of evidence in the record that there was anything wrong about the prices as the date this contract was awarded. They hadn't been updated. They had been updated. It's now agreed that they were inaccurate. That, I think, is not disputed. With all due respect, Your Honor, it is vigorously disputed. There's no question but that Lakeshore made a profit on more than half of the job orders here. That's not what we're talking about. We're talking about the price of steel and so the major aspects they are disputing. The price of steel was due to an inflation spike that Lakeshore says that could not have been predicted. That isn't what your contracting officers testified to. They referred to the hurricane. They referred to what had happened in that part of the world and at least raised a question as to whether the book had been appropriately updated for those areas, not whether there was a profit on other aspects of the project. Your Honor, Judge Allegra dealt with that disputed testimony within footnote 17 of his opinion. The fact of the matter is that Lakeshore knew that Gordian was not verifying the accuracy of the prices, did not guarantee the accuracy of the prices. Lakeshore itself admits that it applied a 6%, that it vigorously, that it carefully, and this is at page 843 of the Joint Appendix, in its price proposal it admits that it carefully considered and analyzed the Gordian book as it was instructed to do in Division Zero. It did exactly what it was told to do in Division Zero and based on its own historical practice, it found that the prices were too low and it applied a 6% upward adjustment based on its own historical experience, which is exactly what it was supposed to do according to the Gordian book, according to Division Zero. It knew that it was supposed to do this and it did do this and it applied an adjustment, a 6% adjustment factor. It did not rely on the Gordian book prices. It provided a 6% adjustment upward factor. It took a business risk and that's what a fixed price contract is. It made a profit on more than 50% of the job items here. It is asking for a conversion of its contract from a fixed price term to a cost reimbursement contract. So at what stage does a significant discrepancy from what both sides believe become a business risk as opposed to a mutual mistake of fact? I mean, well, there are four elements of a mutual mistake of fact and as Judge Allegra found below, none of the four elements has been established here because, again, there is not a scintilla of evidence on the record that there was any systematic problem with the pricing in the Gordian book. Otherwise, they would not have made a profit on more than 50% of the job items. Can I ask you just specifically about that? If you can clarify some aspects of timing. There was an earlier contractor, which Lake Shore I think had some discussions with, and the earlier contractor said something like, the prices, some set of prices are inaccurate and we can't go forward, something like that. And roughly what was the time that that earlier contractor identified the prices as erroneous? I believe that was shortly before the timing of this contract. I'm sorry, Your Honor, I can't be precise. Okay, and you said that the Gordian company did some updating of its book. Was that subsequent to the earlier contractor's? Yes, Your Honor, and Lake Shore's problem is not that they didn't do the updating, that they didn't update all 77 items that they did, that it wasn't an exhaustive updating. But again, Lake Shore was well aware of this. Lake Shore analyzed these prices. No, I'm just trying to, it seems to me there are at least two different things going on here. One is, did they with eyes open understand that the prices they were starting from could not be relied on and therefore assume the risk? And the second is, is there evidence that the actual prices as of the time of the contract were inaccurate? And I think you're making both points. Yes, absolutely. There can be no question that they had actual notice by Division Zero of the contracts they read, and they were given, and they were provided by the government, and we disagree that it was not incorporated in the contract. I think they're relying on the revision, page 320, for instance, the solicitation, which refers to Divisions 1 through 16. It's talking about incorporating them in parallel. If you read that language in context, for instance, it says the UUPB, which is the Gordian book, consists of Divisions 1 through 16 that are applicable Divisions 1 through 16 of the job order contract technical specifications. Well, it would have been nonsensical to, there was no correlation to Division Zero in the job order contract technical specifications, so it would have been absurd to make a reference to Division Zero there. But I will, to page 321, there's a reference to the incorporation of abbreviations in the UUPB modified for Fort Rucker is provided with that volume, which, and those abbreviations are found in Division Zero at page 321 of the Joint Appendix. Those are, I'm sorry, page 358 of the Joint Appendix. Those are where the abbreviations are. So the notion that the government deliberately excluded Division Zero has no support in the text of the contract. It has no support in the economic price adjustment clause, which was specifically only for the option period. There was no incorporation of the FAR economic price adjustment clause. If Lakeshore had any problems with the terms of solicitation, it was required under this court's precedent in blue or gold to raise an objection to the terms of solicitation if they thought they were incompatible with the FAR prior to bidding on the contract. That's what it was supposed to do. I don't, I'm just going to ask you to repeat something because I didn't quite get it. Your first point about why the language on 320 that refers to Divisions 1 through 16 don't really implicitly exclude Division Zero was what? Yes. Was what is my question. Explain that to me. Okay. My point is that if one looks at page 320 in context, it makes it clear that the following documents are attachments. And then there's the job order contract technical specifications, which are provided separately by Compact Disc. And then B is the Gordian book. And that's attached to the contract, including Division Zero. And there's no question here that Lakeshore received Division Zero. And as Judge Allegra said, you really, Division Zero is an explanation for how to use these prices. To the extent that B, paragraph B2, if you're on page 320 with me, the extent that it refers to only Divisions 1 through 16. I agree, I would agree with Lakeshore if it said that UPB consists of Divisions 1 through 16. And it stopped there. I would agree that we might have a problem. But what it says, it continues to say that are applicable to Divisions 1 through 16 of the job order contract technical specifications. And it would have been absurd for the government to specify Division Zero there, because there's no counterpart to Division Zero. I mean, this language has to be read in context. And at no point does the government say, we are excluding Division Zero here. We are verifying the accuracy of prices that the Gordian group itself is explicitly not verifying. Can I ask you the same question I asked Mr. Abernathy? Judge Allegra said that Divisions 1 through 16 don't make enough sense to be used effectively without Division Zero. And therefore, anybody would understand that Division Zero was going along as part of any incorporation of 1 through 16. Can you explain why that's so? In particular, I think Mr. Abernathy said, maybe without anything else, Division 1 through 16 couldn't be effectively used. But it could be effectively used with what's in the contract, your contract. So that Judge Allegra was wrong to say that you need Division Zero for a contractor under this contract to use Division 1 through 16. Well, I think Judge Allegra was saying that if one looks at Division Zero, it provides six pages of explicit directions. And it makes it very clear what the contractor is supposed to consider in doing this bid adjustment. And this is really the contractor's opportunity to use government estimate or baseline prices, and take its own expertise and calibrate its own willingness to do a tradeoff between how much risk am I willing to take to win the contract versus what do I need to do to be a responsible contractor so that I can actually perform the contract and make a reasonable profit, which I repeat, it did on more than 50% of the land I was here. And so there's a lot of direction on pages 355 and 356. Just to make sure you understand my question to the extent I can make it clear. I feel like I'm not answering it. I'm sorry. Could somebody use Division 1 through 16 if they simply never had seen Division Zero? One could conceivably use it, but they may be using it erroneously. And the risk of that would be on them, which is why there's these explicit directions. But if they had the rest of your contract, would any errors in use of 1 through 16 be cleared up? Oh, I see you, Your Honor. No, I think there is not a full recapitulation of the Gordian book instructions in the solicitation. Not a full recapitulation. But there is a partial recapitulation. And the question is enough. I'm sorry. The contractor could not effectively use 1 through 16 without Zero, and therefore must have understood that Zero was going along for the ride. I would say not, Your Honor, because on page 356 it describes general costs. And it says this list is not exhaustive and intended to provide general examples of costs that has to be included in the contractor's adjustment factors as defined in the contract. Then it continues to say the only compensation to be paid to a contractor, and it explains how the compensation will be calculated by the union task price. And then it says no additional payments going on to page 357 of any kind whatsoever will be made. Then there's general interpretations of working height, field and engineering. You know, there's a lot of text here that's not included within the solicitation itself. And Lakeshore is correct. The solicitation itself did list some of these factors. There was not identical wording. We can see that. But then the terms of the solicitation itself made it very clear that it was a non-exhaustive list, and it's most certainly referred to business risk. And, again, reading everything and taking all the contract terms, including the limited economic price adjustment for only the option years, leaves... Can I take you back? I'm sorry. Do you feel like you've responded? I just want to take you back to one of the threads that Judge Newman included, at least as I heard her, in her questions, which is leaving sort of a little to the side the Gordian book question and the accuracy of those numbers. I mean, in this circumstance, we have an instance where, subsequent to that, prices of steel spiked. We have the additional costs and the, you know, inflation that no one could have necessarily predicted as a result of Katrina. So in those circumstances where this isn't a contractor trying to rip off the government, these are practical issues that arose, why shouldn't the government bear some of the obligations with respect to those subsequent unforeseeable events? Thank you, Your Honor. I see I'm out of time, but I actually wanted to have a chance, because I think one of their arguments, one of the primary arguments that Lakeshore is making, is that the government was somehow acting in bad faith because there's a provision in the contract to grant equitable adjustments, and equitable adjustments, you know, why not? Why wouldn't the government grant an equitable adjustment? Here, the government really shouldn't be granting an equitable adjustment because this is the type of risk that the structure of the contract is a fixed price term with very limited economic price adjustments. This is not a cost reimbursement contract, and this is not something, the contract allocated the risk between the parties, and it may be harsh, but this is what the contractor bargained for. And when the government is not responsible, this is not a case where the government is responsible for a delay, which is typically when the government... So the government's position is that the risk of hurricane and natural catastrophe is part of the type of risk that's normally borne by anybody who deals with the government? It depends on how the contract allocates that risk, and in this contract, with the economic price adjustment factor, the contractor bore the risk of inflation that's not covered by the very limited economic price adjustment factor to which it agreed. If it didn't want to have that risk, it didn't have to bid on the contract, it didn't have to take this contract, and this is not a hardship because this contractor has borne a profit on more than 50% of its line items, so it got the benefit of its bargain, and the government here is not acting in bad faith when it does not grant an equitable adjustment to which the contractor has no legal entitlement under the terms of the contract to which it agreed. Can I just ask one more question? Explain to me how you distinguish the Spirin case. Sure, Your Honor. The Spirin case involves design specifications when the government is warranting and saying, if you follow this, I'll use a cake or cookbook, if you follow these cookbook recipe type of directions and you follow these according to our design specifications, then you will get a product that will work, that will function, and then it will not result in cost overruns. And that is something where the contractor can say, if I do what you tell me to do, then I'm not going to lose money. In this case, these were not specifications. First of all, the Gordian book itself was explicitly not warranting the accuracy of these, and the government itself was not saying that these prices, or you, contractor, a business person in the world, can assume that price is going to remain stagnant for a five-year period of the contract. That's unreasonable for any adult, really, to think in this business. What they're saying is these are our best guess, our best understanding of the local prices at Fort Rucker, and you consider a variety of factors to make an adjustment to that. The Spirin doctrine really applies in the case where the government is providing specifications for the contractor to follow and do something and make something for the government. Does that answer your question? Well enough. Okay, thank you. Okay, thank you, Ms. McCarthy. Mr. Aubrey, anything? So the government says only 50% of the prices in the book were wrong, so no harm, no foul. That's simply not the law or the facts. The government still says, well, really, Section 0 was incorporated because it was attached, even though we've now seen that the government specifically said Sections 1 through 16 are incorporated, and even though it cherry-picked language from Section 0 and put in the specifications, why would it cherry-pick language from Section 0 and repeat just certain language in the contract if it incorporated all of Section 0? That simply doesn't make sense. Can I ask you, what evidence did you have that at the time of the contracting, was that April 2007, I think, that actual evidence that the prices in the book were wrong as of then? There was no evidence that they were wrong as of then. There was evidence from the prior contractor that they were wrong in 06 because of the effects of Hurricane Katrina. But then there had been at least some change, and even the evidence from the previous contractor would be hearsay as to its truth here. Is that right? Could be hearsay, but what the government told the bidders at the pre-bid conference is, we've updated the book. You now have an updated book modified for Fort Rucker. Okay, so back to my original question. What evidence did you submit to the trial court that the prices in the updated book were inaccurate as of that date? It's almost self-proving, Your Honor, because there are detailed cost reports showing what the cost was for Lakeshore to do the work that the government assigned to it. You take those costs, you back out all the overhead, all the general and administrative, all the subcontractor profit, and you're left with direct costs. That's apples to apples to the book. How do we know that the prices, that your costs, which necessarily were incurred after April 2007, I think your first job started the end of July, right? Of 08, I believe, Your Honor. How do we know that your costs weren't based on changes in the cost of the items from the April 2007 prices in the book? There's certainly no evidence that there was a dramatic change in that six-month period between contract award and the beginning of work. We know from the fact that the superficial manner in which the Gordian book tried to update their prices, out of 2,500 pages, they updated four pages of items. It would boggle the mind if they got it right. They certainly didn't update steel prices, metal prices. Since it would boggle the mind if they got it right, doesn't that confirm the reasons to think that you knew that you couldn't rely on them at the time? But the contractors didn't know what the Gordian group did to update. They were simply told by the government, the Gordian group has updated this book, and it now is updated and modified for Ford Rucker. We didn't find out until discovery that the Gordian book only did four pages out of the 2,500 pages of updated prices. What is the relief that's being requested? Is it directed and limited to the difference in the actual cost of the materials as listed in the book? The direct cost only. The direct cost only. If they lost money on markups, they have to eat it. But when you compare direct cost actually incurred on the site during the first and second year of the contract to the direct cost in the Gordian book, the difference should be the relief. And what was the item in the record, the order of magnitude? Just over a million dollars. Okay. I thought it was closer to two million. I think it started out at 1.9. There's an expert report in the record. I'll give you the record number, but I think it was reduced down to between a million and that original number. The estimates went around about five or six different times, didn't they, your expert? Pardon? Didn't your expert change his estimate five or six different times during the procedures? Well, the Lakeshore original damage was based on internal work, and then we later hired a damage expert to put together all the calculations, and that's when the numbers changed. His numbers didn't change five times, but the numbers internally within Lakeshore were changed several times before the expert was hired. Okay. Do we? And closing. Okay, you can have the last word. Thank you, Your Honor. Thank you. Thank you both. The case is taken under submission.